**UNITED STATES PIPE & FOUNDRY
CO. v. CITY OF WACO et al.**

No. 1732.

Court of Civil Appeals of Texas. Waco.

Nov. 19, 1936.

Rehearing Denied Jan. 21, 1937.

1100

Naman & Howell, of Waco, for appellant.

McClellan, Lincoln & Williams, Sam Darden, Allan McDonnell, and John McGlasson, all of Waco, Worsham, Burford, Ryburn & Hincks, of Dallas, Witt, Terrell & Witt, of Waco, A. S. Rollins, of Greenville, Bryan & Maxwell, of Waco, Bromberg, Leftwich, Carrington & Gowan, of Dallas, C. B. Emery, of Waco, and I. J. Walker, of Dallas, for appellees.

ALEXANDER, Justice.

The City of Waco contracted for and had constructed a pipe line for the conveyance of water for municipal purposes from Lake Waco to the city's filteration plant. The line proved defective and as a consequence the city brought this suit against O. N. Floyd and J. L. Lochridge, the engineers who drew the plans and specifications, W. E. Callahan Construction Company, the contractor, and United States Pipe & Foundry Company, who manufactured and furnished the pipe used in constructing the line, to recover the damages resulting therefrom. Plaintiff's pleadings, so far as is material to the issues to be discussed, alleged that in 1928 the City of Waco employed Floyd and Lochridge as engineers to survey, lay out, design, and supervise the construction of the pipe line in question; that W. E. Callahan Construction Company, which we will refer to as Callahan Company, was engaged in building Lake Waco and was a prospective bidder for the contract to build the pipe line and that United States Pipe & Foundry Company, which we will call the Pipe Company, was engaged in manufacturing pipe such as was used in the construction of such lines; and that said engineers and the Callahan Company and the Pipe Company entered into a conspiracy for their own mutual benefits whereby it was understood that said engineers would specify Hi-tensile pipe, a particular brand of pipe manufactured by the Pipe Company, as the material out of which the line should be built, and that Callahan Company would secure the contract and would build said line out of pipe purchased from the Pipe Company; that if said defendants did not so conspire, they nevertheless acted separately to accomplish the same purposes; that the defendant Pipe Company advocated and by false representations induced the adoption of plans calling for the construction of said line out of a light grade of Hi-tensile pipe; that defendant Pipe Company falsely and fraudulently represented to the city and its engineers that Hi-tensile pipe of the grade suggested by it and as called for in said specifications, when cast in accordance with its specifications, would be adequate in strength for use under deep fills and would be suitable for the building of such line; that said defendant well knew that the kind and grade of pipe advocated by it was too light and would be inadequate in strength for service in the line as contemplated, but that nevertheless it fraudulently induced the city's engineers to breach their contract with the city and to specify such pipe as the material out of which the line would be built and induced the city to agree to allow said line to be built thereof; that after said plans were adopted, the contract for building the line was let to the W. E. Callahan Construction Company, who in turn bought the necessary pipe therefor from the defendant Pipe Company; that the contract as let called for the construction of said line of pipes of three sizes, to wit, 9,000 feet, 37½ inches in diameter; 9,400 feet, 40 inches in diameter, and the balance 42 inches in diameter; that after the contract for the construction of the line had been entered into, the Pipe Company fraudulently induced the engineers to allow the line to be constructed of pipes of two sizes only, to wit, 37½ inches and 42½ inches, respectively, and that the Pipe Company so supplied pipe of the latter dimensions and

caused the same to be installed in said line, which changes in designs constituted a material departure from the original specifications; that the pipe as actually furnished by said Pipe Company and installed in the construction of said line was too light, and particularly it was charged that the bell portion of the pipe as furnished by the Pipe Company and actually installed was too light to withstand the stress of the overburden in the deep fills; and that as a consequence the line proved defective and was worthless. Plaintiff sought to recover against all the defendants jointly because of the alleged conspiracy and in the alternative sought recovery against each defendant separately because of its misconduct in the premises.

The jury, in answer to special issues, found that the Pipe Company, through its agents and representatives, Mr. Stokes and Mr. Hanlon, represented to the city's engineers that the Hi-tensile cast iron pipe which was actually specified and supplied for use in constructing the line would be adequate in strength for the purpose intended and for the depth of cover under which it would be laid and knowingly induced the city and its engineers to specify such pipe for the construction of said line; that but for such representations the city would not have allowed such pipe to have been so specified and installed; that in truth and in fact said pipe was inadequate in strength for the services intended and particularly for the depth under which it was to be installed and the Pipe Company knew of the conditions under which the pipe was to be laid and knew that said pipe was inadequate, or should have known it by the exercise of reasonable diligence; that the use of the two size combination of pipe actually used in the construction of the line constituted a material departure from the original specifications and the pipe so used was not substantially equal in strength to the 40-inch pipe originally provided for; that the Pipe Company represented that the two-size combination of pipe actually used in the construction of the line was adequate in strength for the depth of covering under which it would be laid, and the plaintiff believed such representations and but therefor would not have installed such pipe in the line; that the city was not aware of the inadequacy in strength of the line and could not have known thereof by the exercise of reasonable diligence until after the line had been accepted; that the material departure in the use of two-size pipe combination for the three-size pipe combination as originally specified consisted in the use of different bells from those provided for in the original specifications; and that the reasonable value of the line as actually constructed, as of the date of its acceptance by the City of Waco, was $150,000. Based upon the foregoing findings, judgment was rendered for the city against the United States Pipe & Foundry Company for the sum of $237,159.78, that being the difference between the original cost of the line and its actual value as found by the jury. All other defendants were discharged. The Pipe Company appealed.

Appellant's first major proposition is that the Pipe Company's representatives did not make any misrepresentations as to the sufficiency of its pipe for the job in question, but that any representations made by them were mere expressions of opinion, which opinions were accepted as such by the city's engineers; that the pipe manufactured by appellant was a standard product and the city's engineers had before them proper data showing the chemical content of such pipe, the results of certain laboratory tests that had been made for the purpose of testing the strength of such pipe, and the methods used in making such tests; that the question as to whether such pipe was sufficient for the job in question was purely an engineering problem to be calculated by the city's engineers, who were experts in their line capable of making such calculations, and therefore they had no right to rely on the opinions so expressed by appellant's representatives, and such representations could not constitute the basis of actionable fraud. Its second major contention is that there was no contractual relation between appellant and the City of Waco, and consequently appellant is not responsible for any damages that may have accrued to the city by reason of any misrepresentations on its part made to the city's engineers as to the sufficiency of the pipe for the job in question.

We will first review the facts concerning the nature of the representations claimed to have been made by the Pipe Company and relied on by the city and the relation that existed between the parties at the time these events occurred. The evidence shows that in 1928 Callahan Company was engaged in building Lake Waco for the city. During the same year the city employed Floyd and Lochridge, engineers, to survey, lay out, design, and supervise the construction of a pipe line from said lake to the city's filteration plant, a distance of approximately 28,500 feet. It was understood that the line

was to be large enough to carry twenty million gallons of water per day. The Pipe Company was engaged in the manufacture of cast-iron pipe. It was also engaged in the manufacture of a high tensile pipe under the trade-name of "Hi-tensile." High tensile is a kind of cast iron, but on account of its chemical content, pipe made thereof is stronger in proportion to the amount of metal used than ordinary cast-iron pipe. The formula by which it is manufactured is not·a secret and such pipe is manufactured by other concerns in the United States but appellant appears to be the. chief producer thereof. Ordinary cast-iron pipe had been in use for many years and its qualities and fitness for use in heavy flow lines were well known, but Hi-tensile pipe was of rather recent origin and had been in use for only a few years. Early in 1929 Captain McFarland, vice president of Callahan Company, visited the offices of the Pipe Company in Philadelphia for the purpose of discussing the proposed letting of the contract for the construction of the pipe line and to arrange with that company for co-operation with his company in bidding on and securing the contract to build the pipe line in question. He and Mr. Stokes, vice president of the Pipe Company, discussed the fact that Callahan Company was engaged in constructing the lake and had its equipment on the ground and would be a logical bidder for the contract to construct the pipe line; that the city had a limited amount of funds available for the job and would desire to keep the cost as low as practicable, and, for that reason, concrete, which was a cheaper building material than cast iron, might furnish considerable competition as against ordinary cast-iron pipe; and that such competition could probably be met only by offering as a substitute· Hi-tensile pipe, which was lighter than ordinary cast-iron pipe. Mr. Stokes represented to Captain McFarland that Hi-tensile pipe had been used in flow lines in many places and had given satisfaction and would be suitable for a line such as was to be built at Waco. It was finally concluded that the Pipe Company would forward to Captain McFarland some literature concerning the merits of Hi-tensile pipe, which Captain McFarland would pass on to the engineers of the City of Waco, and that an effort would be made to induce the city's engineers to specify Hi-tensile in the specifications as the material out of which the line would be built; that the Pipe Company would give Callahan Company as low bid on Hi-tensile pipe as it would give to any other prospective bidder on the contract and would co-operate with the Callahan Company in securing the contract and in building the line, the purpose of all of which, according to the testimony of Mr. Stokes, was to enable the Pipe Company to sell its pipe for the job in question. While there was no direct evidence that the Pipe Company agreed to give Callahan Company a lower price on Hi-tensile pipe than it would give to any other prospective bidder, nor that Callahan Company agreed to bid on nothing but Hi-tensile pipe, the evidence does show that the Callahan Company actually bid on nothing but Hi-tensile pipe and the Pipe Company quoted Callahan Company a lower price on Hi-tensile pipe than it quoted to any other bidder on the same job. This evidence shows a definite design on the part of the Pipe Company to induce the city's engineers to specify Hi-tensile pipe as the material out of which the line would be constructed. The purpose was to enable the Pipe Company to sell its pipe for the job. Floyd and Lochridge were experienced engineers, but they had never built a large flow line such as would be required in this instance, and they had had no experience with Hi-tensile pipe. In fact, Hi-tensile pipe of large internal dimensions, such as would be needed for this project, had never been used in deep fills under conditions such as was required for the Waco job. Shortly after the Philadelphia interview between Captain McFarland and Mr. Stokes, the Pipe Company began its drive to induce the city's engineers, Floyd and Lochridge, to specify Hi-tensile pipe as the material out of which the line should be built. In order to accomplish this purpose, the Pipe Company forwarded to said engineers, both directly and through the Callahan Company, much literature concerning the merits of Hi-tensile pipe and its suitableness for a job such as was here under consideration. Among other literature so forwarded was a report of the Pipe Company's experts to said company showing the chemical analysis of Hi-tensile pipe, the method and results of certain laboratory tests that had been made for the purpose of demonstrating the strength of Hi-tensile pipe. This report read in part as follows:

"Strength of Pipe Under External Load.

"In connection with lettings in the South, it has recently been necessary for us to guarantee the supporting strength of cast iron pipe. Recently tests were made at Burlington on 36"pipe and all classes were found

to be much stronger than required by the various Specifications. Some of these tests were made in the presence of outside Engineers and the results checked very carefully."

After describing the tests that had been made and the results obtained, the following material statements were made:

"Comparative Strength of Hi-tensile and Regular Sand Cast Pipe Under Crushing Loads.

"Objects of Test

"First: To determine the suitability of cast iron pipe of comparatively thin sections for use under deep fills.

"Second: To determine whether the Modulus of Rupture calculated from the test bars is indicative of the strength of the pipe under this load.

"Third: To determine the comparative strength of Hi-tensile and regular sand cast pipe under these conditions. * * *

"Conclusions

"First: It is evident that cast iron pipe of standard dimensions has ample strength for use under heavy fills. * * *

"Third: That Hi-tensile pipe cast in accordance with our Specifications is amply strong for use under deep fills and meets the requirements of Specifications for culvert service."

In this connection it should be noted that all of the tests referred to in said report were made on specimens of the barrel portion of the pipe and not on the bell portion thereof, and that, according to the testimony, the pipe actually furnished by the Pipe Company and installed in the Waco line, while sufficient to withstand the internal strain, was too light to withstand the overburden or external stress and that most, if not all, of the breaks complained of occurred in the bell portion of the pipe. The water head from the low point to the high point in the proposed line was less than 100 feet and the city's engineers entertained no doubt as to the sufficiency of Hi-tensile pipe to withstand the internal strain, but they were doubtful about its suitableness to withstand the external stress or overburden in deep fills, particularly where the pipe was to be as large as was necessary to be used in the line under consideration. They had before them the results of the laboratory tests above referred to and could calculate for themselves the weight of the external load to be carried by the line when in place under the deep fills, but they were afraid

that the tests previously made by the company for the purpose of showing the strength of individual pieces of the pipe did not fully reflect what the pipe would do when placed under ground in actual service. They were anxious and solicitous for information as to what such pipe had done when put to the actual test. They were referred by the Pipe Company to a number of places throughout the United States where Hi-tensile had been used in flow lines, but it does not appear that in any of these lines pipes of large dimensions had been used in deep fills such as was required by the Waco job. It also appears that each of these projects to which the engineers were referred had been built prior to the adoption of the new designs for the bell portion of Hi-tensile pipe, as hereinafter more fully explained, and hence said lines were not built of pipe with light bells such as were supplied for the Waco job. Mr. Hanlon, the Pipe Company's southwestern salesman, who was undertaking to induce the city's engineers to specify Hi-tensile pipe as manufactured by his company, had worked for the company for fifteen years and was experienced in all its branches. Prior to completion of the specifications both Hanlon and the home office of the company had been furnished with a profile of the proposed line and knew the dimensions of the pipe needed and the depth of the fills under which it was to be laid. The city's engineers made numerous specific inquiries of Hanlon as to whether Hi-tensile pipe of the class and dimensions as proposed by his company would be suitable for deep fills under conditions such as it would be subjected to in the Waco job. Mr. Hanlon gave the city's engineers his unqualified assurance that the pipe suggested by his company was of adequate strength for the job and that such pipe had stood deep fills at other places. As a result of this literature and these interviews, the city's engineers were finally induced to specify Hi-tensile as the material out of which the line could be built, and they were likewise induced to use the Pipe Company's blueprints and specifications as to the chemical content, weight, and dimensions of the pipe to be used. The home office of the Pipe Company was fully informed of Mr. Hanlon's success in this line. Item 11 of the specifications, as drawn by the city's engineers, called for the construction of a line 40 inches in diameter and provided in part as follows: "The pipe shall be Hi-tensile cast iron pipe of the dimensions shown on U. S. Cast Iron Pipe &

Foundry Company's blue print No. 12628 for 100 foot head or an approved equal." Item 12 of the same specifications provided for an alternate bid as follows: "The contractor may bid on this item as an alternate for Item 11. In order to facilitate deliveries, three sizes of cast iron pipe may be used, viz: 9000 feet of 37½ inch inside diameter, which is a heavier class of 36 inch pipe cored out for the Class A head; 9400 feet of 40 inch inside diameter pipe, which is a heavier class meter pipe cored out for .the Class A head, and the balance of 42 inch inside diameter pipe. Other combinations of sizes giving the same capacity for the same average hydraulic grade line will be considered. Hi-tensile or standard cast iron pipe may be used. Except as to sizes of pipe, the specifications for Item 11 shall govern if Item 12 is used." The specifications contained drawings showing in detail the thickness and other dimensions of the bell portion of the pipe to be used in the event the line should be built of 40-inch Hi-tensile pipe, as called for in item 11, but there was nothing other than the above quotation from item 12 to show the size of such bell in the event Hi-tensile in sizes other than 40-inch should be used. However, at the time the specifications were drawn the city's engineers had been furnished by the Pipe Company with blueprints showing the thickness and weight of the bells on the 37½-inch and 42½-inch pipes as manufactured by said Pipe Company. The bells on these pipes, as shown by such blueprints, were much thinner and lighter in proportion to the size of the barrel of the pipe than were the bells on the 40-inch pipe as provided for in the specifications. One of the city's engineers testified that he assumed that the manufacturer of the pipe knew more about designing the bell to suit the barrel of the pipe than any one else and that he left it to the Pipe Company to make the bell of strength corresponding to the barrel thereof. The Callahan Company was awarded the contract to construct the line of Hi-tensile pipe of the three dimensions as provided for in item 12 and immediately arranged with the United States Pipe & Foundry Company to manufacture the pipe for the job. Later it was discovered that the Pipe Company could not supply the 40-inch pipe as rapidly as needed and at .the Pipe Company's request the city's engineers agreed to allow the line to be built of pipes of two sizes instead of three, a portion of which should be 37½ inches in diameter and the balance 42½ inches in diameter.

The line was constructed with pipe so furnished by the Pipe Company and was completed about June, 1930. From the time of its completion to the time of the trial in 1934, approximately seventy-five breaks occurred in the line, each of which materially interrupted the city's water supply from the lake. Each of the breaks occurred in the bell and extended down into the barrel portion of the pipe. Several experts testified that the pipe used in building the line, and especially the bell portion thereof, was too light and that on account thereof and in the light of its previous history as to breakage, the line could not be depended on to supply the city with water and was practically worthless. The bells on the two sizes of pipe as actually furnished by the Pipe Company and installed in the line were apparently of the weight and dimensions called for in the Pipe Company's blueprints, copies of which were in possession of the city's engineers at the time the specifications were drawn, but they were not as heavy in proportion to the barrel of the pipe as were the bells on the 40-inch pipe as called for in item 11 of the specifications. Experts testified that the weight of the bell on all pipes should be in proportion to the size of the barrel; that the bell on the 40-inch pipe, if made as required by the specifications, would weigh 440 pounds; that by using the same ratio of proportion, the bell on the 42½-inch pipe should have weighed 466 pounds, whereas it only weighed 327 pounds; and that the bell on the 37½-inch pipe should have weighed 415 pounds, whereas it only weighed 263 pounds. Mr. Anthony, an engineer formerly in the employment of the Pipe Company and at that time engaged in its production department, but not with the company at the time of the trial, testified that prior to the letting of the Waco contract, the Pipe Company, in manufacturing Hi-tensile pipe of the sizes in question, used a much stronger bell than was used on the Waco job, but that about six months or a year prior to the letting of the Waco contract, at the request of Mr. Stokes, he had been required to cut down on the size of the bells on pipes of the sizes used at Waco, so that in his opinion the bells were not as strong in proportion as were the barrels of these pipes; that Mr. Stokes had ordered the bells cut down "to suit the eye" and not in accordance with their strength; that witness had complained at the time and had contended that the bells as reduced were too weak and would not stand the strain of calking and

the overload; and that after the Waco line had been completed and the breaks were reported to the Pipe Company, it adopted new designs for bells, increasing the weight thereof. Mr. Stokes, vice president of the company, apparently admitted that a few months or a year prior to the letting of the Waco contract the company had changed the designs on the 37½-inch and 42½-inch pipe so as to materially reduce the weight of the bells thereof, but denied that Mr. Anthony, then chief engineer of the company, had protested that the bells when so manufactured would be too light. He also admitted, while on the witness stand, that the pipe supplied for and installed in the Waco job was too light to withstand the external stress, but contended that it met the requirements of the specifications and that his company had made recommendations only as to the fitness of the pipe to withstand the internal and not the external stress. It was his contention that the matter of overburden involved purely an engineering problem, the data concerning which was easily accessible to the city's engineers, and that they should have protected the city in this respect by specifying heavier pipe.

We will first discuss the question whether there was such contractual relation between the parties as to authorize the city to recover against the Pipe Company on account of the latter's alleged misrepresentations concerning the suitableness of the pipe used in building the pipe line. It may be conceded that with few exceptions a manufacturer who sells his goods to an independent dealer is not liable to a consumer who purchases from such dealer merely on account of misrepresentations made by the manufacturer to the dealer. This is because there is no direct contractual relation between the manufacturer and the consumer and because of a wise public policy that there should be some fixed and definite limitation to the liability of the manufacturer, whereas if indefinite, subsequent purchasers should be allowed to recover, there would be no end to the manufacturer's liability. But the case here under consideration is not one in which the manufacturer sold to an independent dealer and the latter in turn sold to a consumer of his own selection. Here the Pipe Company, as the manufacturer, and the city, as the ultimate consumer, were not strangers to each other in the transaction. The city desired to let a contract for the furnishing of the necessary material and the installation of a pipe line. Callahan Company could

build the line but had no pipe. The Pipe Company had the pipe but could not install it. The result was that the Pipe Company and Callahan Company formed a common design to induce the city to agree to permit the line to be built of Hi-tensile pipe, a pipe manufactured by appellant, and to secure the contract for Callahan Company to build the line of such material. It was contemplated that Callahan Company would buy from the Pipe Company the pipe necessary to fulfill the contract, and each of the parties would then have accomplished his purpose. The evidence is undisputed that the Pipe Company and Callahan Company were working together for a common purpose. The Pipe Company by its representations induced the city to specify Hi-tensile pipe and to agree to allow the line to be built of pipe cast in accordance with the Pipe Company's specifications. The Pipe Company aided Callahan Company in securing the contract, to the exclusion of all other bidders, by giving to it a lower quotation than was given to other prospective bidders. Callahan Company bid on nothing but Hi-tensile pipe, thereby excluding all other materials, and secured the contract to build the line of such material. The Pipe Company then manufactured the pipe for this project and sold the same to Callahan Company, and the city, by reason of the representations of the Pipe Company, was induced to allow such pipe to be installed and to accept the line when built thereof. That the Pipe Company knew that the particular pipe sold by it to Callahan Company was to be used exclusively in building the Waco line is shown by the fact that each joint of such pipe had the word "Waco" imbedded or cast therein. We think there was such intimacy of relationship between the parties as to make the Pipe Company a party to the contract in the sale of the pipe to the city. Callahan Company was but the agency or means employed by the Pipe Company in selling the pipe to the city. Under these circumstances, we think the Pipe Company can be held for breach of contract because of its misrepresentations as to the suitableness of its pipe for the purposes intended. Timberland Lumber Co. v. Climax Mfg. Co. (C.C.A.) 61 F.(2d) 391; Richardson Machinery Co. v. Brown, 95 Kan. 685, 149 P. 434; Williston on Sales (2d Ed.) Vol. 1, Page 488, § 244.

It is said that "any positive affirmation, or representation, made by the vendor, at the time of the sale, with respect to the subject of sale, which operates, or may op-

erate, as inducement, unless it be the expression of mere matter of opinion, in a case where the vendee had no right to rely upon it, or be purely matter of description, or identification, without fraud, and not intended as a warranty, constitutes a' warranty." Blythe v. Speake, 23 Tex. 429; 37 Tex.Jur. 250, 265; Cullers & Henry v. Wilson, 2 Willson, Civ.Cas.Ct.App. §§ 816, 819; Barnum Wire & Iron Works v. Seley, 34 Tex.Civ.App. 47, 77 S.W. 827; Harrell v. McDuffie, 61 Tex.Civ.App. 30, 128 S.W. 1149; El Paso & S. W. Ry. Co. v. Eichel & Weikel (Tex.Civ.App.) 130 S.W. 922; Roberts v. Roberts '(Tex.Civ.App.) 27 S.W. (2d) 880.

■ Among other representations made by appellant as to the qualities and suitableness of its pipe was that contained in the report of its experts, a copy of which was forwarded by Stokes, appellant's vice president, to the city's engineers. This report represented that suitable and appropriate tests (setting out the nature of such tests and results obtained) had been made on specimen bars of pipe material for the purpose of determining the suitableness of ordinary cast-iron pipe for use under deep fills and to determine the comparative strength of Hi-tensile and ordinary cast-iron pipe under crushing loads and concluded with the statement "that Hi-tensile pipe cast in accordance with our specifications is amply strong for use under deep fills and meets the requirements of specifications for culvert services." While the last-quoted clause was contained under the heading "Conclusions," this did not render the representation by the Pipe Company a mere expression of an opinion. The report purported to be the findings and conclusions reached, not by ordinary engineers but by experts in the pipe business, after appropriate tests had been made for the purpose of ascertaining the facts. The Pipe Company, by forwarding the report to the city's engineers, thereby adopted the statements contained in the report as its own and put the same forward as the Pipe Company's ·epresentations that pipe so manufactured was of adequate strength for deep fills. Such statements when so advanced for the purpose of inducing the sale amounted to warranties as to the suitableness of the pipe, for a breach of which an action will lie. 55 C.J. 688, § 690. Moreover, the appellant's southwestern sales manager, at the time the specifications were being drawn and. with full knowledge of the conditions under which the pipe was to be used, gave the city's engineers his unqualified assurance that such pipe had withstood the strain of deep fills at other places and was of adequate strength for the Waco job. These representations amounted to express warranties, for a breach of which appellant is liable. Roberts v. Roberts (Tex.Civ.App.) 27 S.W.(2d) 880; Free Sewing Machine Co. v. S. T. Atkin Furniture Co. (Tex.Civ.App.) 71 S.W.(2d) 604. Furthermore, after the plans had been drawn and the contract let, appellant's sales manager persuaded the city's engineers to permit a change to be made in the sizes of the pipes to be installed and· to allow the line to be built of pipes of two sizes, to wit, 37½-inch and 42½-inch in diameter and manufactured in accordance with appellant's specifications. The fact that this change had been induced by appellant's sales manager was fully communicated to the company. In fact, the Pipe Company was charged as a matter of law with notice of all information thus obtained by its said sales manager in the course of his employment. 2 Tex.Jur. 563–570; Bailey v. Sovereign Camp, W. O. W., 116 Tex. 160, 286 S.W. 456, 288 S.W. 115, 47 A.L.R. 876; Calhoun v. The Maccabees (Tex.Com.App.) 241 S.W. 101. Thereafter, with full knowledge of the facts and circumstances under which the city proposed to use the pipe, and with imputed, if not actual, knowledge that its sales manager in making the sale had represented that the pipe was of adequate strength for the purposes intended, appellant manufactured · and delivered the pipe for installation in the line and permitted it to be installed and ·thereby impliedly represented that it was suitable for the. purposes for which it had been bought. 37 Tex.Jur. 290; Turner & Clayton, Inc., v. Shackelford (Tex.Com. App.) 288 S.W. 815. The jury on ample evidence found that the pipe specified in the specifications for use in the Waco line was inadequate in strength for the services intended and that the pipe actually installed in the line was inadequate in strength for the depth of cover under which it was laid. There was therefore a breach of the warranties above referred to.

In this connection, we take note of appellant's contention that the question of whether the pipe offered by it was of sufficient strength to withstand the overburden was purely an engineering problem, and since the city's engineers were experts in that line and had been furnished with accurate data showing the results of tests that had been made for the purpose of demonstrating the strength of such pipe and said

engineers could calculate for themselves the weight of the overburden, they could have ascertained for themselves whether the pipe offered by the Pipe Company was adequate and should not have relied on the representations made by appellant in this instance. Appellant also calls attention to the fact that said engineers were furnished with a list of projects where cast-iron pipe had been used, and they could have investigated and ascertained for themselves whether or not it was giving satisfactory service. However, the city's engineers testified that while they had before them the results of tests made by the Pipe Company and other data showing the strength of specimens of such pipe and could have calculated the weight of the overburden, such data "did not tell the whole story." They were afraid to risk this data as furnishing an accurate indication as to what the pipe would do when placed in actual service. It was for this reason that they demanded further assurance from the Pipe Company that such pipe had rendered satisfactory service elsewhere and would be adequate for the Waco line. They were referred to other projects, and the engineers made inquiry concerning two or three of them and found that the pipe was satisfactory, but it does not appear that in either of these lines pipes of large dimensions had been buried under as deep fills as was required by the Waco line. The record also discloses that each of these projects had been constructed before the company had reduced the weight of the bells on pipes of the size sold for the Waco job. There is nothing to indicate that the city's engineers knew that the Pipe Company had adopted new specifications calling for lighter bells subsequent to the building of the projects referred to. For that reason, these projects did not furnish an accurate indication of what might be expected of the pipe proposed to be sold for the Waco job, and since the city's engineers were not advised that there had been a change in the specifications, we think the jury was justified in its findings that the city could not, by the exercise of reasonable diligence, have known that the pipe specified and sold for the Waco job was inadequate in strength for the purposes intended. We do not think the appellant is in any position to defend on the ground that the city and its engineers by more diligent inquiry could have ascertained that appellant's representations concerning the suitableness of its pipe were untrue. Buchanan v. Burnett, 102 Tex. 492, 495, 119 S.W. 1141, 132 Am.St.Rep. 900.

But if we be mistaken in our view that there was such contractual relation between the Pipe Company and the city as to authorize the city to recover because of breach of warranty, we think nevertheless the city is entitled to recover on the ground of fraud. It will be recalled that Hi-tensile pipe had been in use only a few years, and the city's engineers were unfamiliar with the use thereof. The Pipe Company had recently materially reduced the thickness and weight of the bells on its 37½-inch and 42½-inch pipe and was therefore selling for use in the Waco job, pipe manufactured in accordance with new specifications. Apparently pipe manufactured according to these new specifications had never been tested by actual use. The Pipe Company represented that Hi-tensile pipe cast in accordance with its specifications was amply strong for use in deep fills and its sales manager represented that such pipe had withstood the strain of deep fills at other places and was of adequate strength for the Waco job. Appellant's former chief engineer testified that he had protested against the use of the new specifications calling for light bells and had informed the vice president of the company that bells cast in accordance with the new specifications would be too light and would not stand the calking strain nor the overload. But the vice president was undertaking to manufacture a light pipe that would eliminate concrete as a competitive building material, and consequently he overruled or ignored the protest of the company's chief engineer. It developed that the light bells on the pipe manufactured for the Waco job in accordance with these new specifications were too light and that the line broke down as a result thereof. The jury found that appellant's representatives knew or had reasonable cause to know that pipes of the two sizes sold for installation in the Waco line were inadequate in strength for the depth of cover under which they were to be laid, but that nevertheless said agents represented that such pipe was adequate in strength for such purposes. The evidence was sufficient to support such findings. Apparently appellant, in order to meet competition, was selling for use in the Waco job a product manufactured in accordance with a new and untested design, and according to the findings of the jury it either knew that such pipe was inadequate in strength for the purposes for which it was to be used or was acting in reckless disregard of the consequences. A false affirmation of a material fact made for the purpose of inducing a

bargain which actually accomplishes the purposes intended will give ground for an action in damages for fraud. Ordinarily, a mere expression of an opinion does not amount to fraud, but when one purports to know and for the purpose of inducing a bargain puts forward as a fact that which otherwise would be but a mere opinion and the other party in the exercise of reasonable diligence has a right to rely thereon and does rely thereon as the speaker expects him to do and is deceived thereby, the one making the representation ought to be held liable in fraud for the consequences. 26 C.J. 1083, § 20. An expert's opinion as to a matter susceptible of knowledge, when given by one professing to know what he is talking about, may be regarded as a statement of fact and form the basis of fraud. 26 C.J. 1085, 1086. This is particularly true where the one making the statement knows it to be untrue or makes the statement in reckless disregard of the truth thereof. Houston v. Darnell Lumber Co. (Tex.Civ.App.) 146 S.W. 1061; Henderson v. San Antonio & M. G. Ry. Co., 17 Tex. 560, 67 Am.Dec. 675; International & G. N. Ry. Co. v. Shuford, 36 Tex.Civ.App. 251, 81 S.W. 1189; Riggins v. Trickey, 46 Tex.Civ.App. 569, 102 S.W. 918. Under these circumstances, we think the city is entitled to recover because of appellant's fraud, even though there was no contractual relation between the parties.

The appellant is a foreign corporation with a permit to do business in this state and having its principal place of business in Dallas. Its plea of privilege to be sued in Dallas county was overruled, and this ruling is assigned as error. The evidence shows that all of the representations made by the representatives of the Pipe Company to the city's engineers were made in Dallas county. It is upon this theory that appellant contends that the trial court erred in permitting the suit to be maintained in McLennan county. Under the provisions of Revised Statutes, art. 1995, subds. 23 and 27, the plaintiff had a right to maintain the suit against the appellant, as a corporation, in any county in which the cause of action or a part thereof arose. A cause of action consists not alone of the genesis of the right but of the breach of the right, and in order to maintain the suit in some county other than that in which the corporation's principal place of business is located, it is necessary and only necessary that some part of the primary right, or some part of the transaction relating to the breach of that right, must have occurred in the county where the suit is filed. Stone Fort National Bank v. Forbess (Tex.Sup.) 91 S.W.(2d) 674; Savage v. H. C. Burks & Co. (Tex.Civ.App.) 270 S.W. 244; Mercantile Bank & Trust Co. v. Schuhart, 115 Tex. 114, 277 S.W. 621. It may be conceded that the false representations in the case at bar were made and that the consent of the city's engineers was obtained in Dallas county, but it was known and intended at the time these representations were made that the city of Waco would later, as a result thereof, adopt the specifications recommended by the Pipe Company, enter into a contract for the building of the line in McLennan county, and permit the installation of the pipe manufactured by appellant in accordance with the specifications as recommended by it. Later, as was contemplated by the parties, the board of water commissioners adopted the plans in Waco, entered into a written contract with Callahan Company for the building of the line in McLennan county, and the pipe as manufactured by the Pipe Company was actually installed in McLennan county. It was a part of the original scheme or design that the Pipe Company would furnish the pipe and that it would be installed in McLennan county. While the deceit may have been practiced and the consent of the city's engineers obtained in Dallas county, the purpose of the Pipe Company had not been fully accomplished nor had the city been fully injured until the pipe had been installed in McLennan county and the contract price paid. We think the real injury to the plaintiff occurred at least in part in McLennan county, and therefore plaintiff had a right to maintain the suit in that county. Mercantile Bank & Trust Co. v. Schuhart, supra; Willis v. Victoria Bank & Trust Co. (Tex.Civ.App.) 76 S.W.(2d) 532; Brown v. Gray & Wilmerding (Tex.Civ.App.) 256 S.W. 977; Commercial National Bank v. First National Bank (Tex.Civ.App.) 77 S.W. 239, reversed on other grounds 97 Tex. 536, 80 S.W. 601, 104 Am.St.Rep. 879.

The plaintiff alleged a conspiracy between the city's engineers, Callahan Company, and the Pipe Company to induce the city to specify Hi-tensile pipe and to enter into a contract to build the line out of such material, and that as a result the city was induced to contract for and to accept a line so built and was damaged thereby. The plaintiff sought a judgment against all of the defendants jointly. In the alternative, it was alleged that each of said defendants so deceived the plaintiff and in-

duced the contract, and plaintiff sought judgment against said defendants separately. The Pipe Company filed a plea of misjoinder of causes of action and parties and alleged that in truth and in fact there was no basis for plaintiff's allegations with reference to a conspiracy and a joint action and that said allegations in plaintiff's petition were made without any basis of fact whatever and for the purpose only of endeavoring to hold all defendants jointly in the suit. Such plea in abatement was presented to the court in advance of the trial, the Pipe Company offering at that time to introduce evidence to show that there was no basis for the allegations of conspiracy, but the court took the matter under consideration and stated that he would rule on the plea in abatement at the conclusion of the evidence. Later the trial judge, after hearing the evidence, overruled the plea of misjoinder. This ruling is assigned as error. The petition was sufficient to state a joint cause of action against all defendants. Although the ruling on the plea in abatement was delayed until all evidence had been introduced on the main case, the hearing on the plea appears to have been submitted to the court and not to the jury. The fact that the court overruled the plea implies a finding against it, and if there is evidence to support such finding, there was no error in the trial court's ruling. We cannot say as a matter of law that there was no evidence to support the charge of conspiracy. The fact that no such issue was later submitted to the jury on the trial on the merits does not necessarily lead to the conclusion that there was no evidence to establish conspiracy. We also think the plaintiff had a right to join in the same suit its joint cause of action against all defendants growing out of the alleged conspiracy and its alternative action against each of the defendants separately, where each and all of the alleged causes of action grew out of the same transaction and could be established by substantially the same evidence. Floyd v. Patterson, 72 Tex. 202, 207, 10 S.W. 526, 13 Am. St.Rep. 787; Milliken v. Callahan Co., 69 Tex. 205, 6 S.W. 681; Hudmon v. Foster (Tex.Com.App.) 231 S.W. 346; Compton v. Ashley (Tex.Civ.App.) 28 S.W. 223; Paul v. Sweeney (Tex.Civ.App.) 188 S.W. 525; Cox v. Sinclair Gulf Oil Co. (Tex.Civ.App.) 265 S.W. 196.

The plaintiff's suit as originally brought was against the three defendants heretofore named and also against Fidelity & Deposit Company of Maryland. Several of the defendants filed petitions to remove the cause to the federal court. On December 22, 1932, the federal court, at its fall term, heard a motion to remand to the state court and at that time announced its judgment dismissing the suit as against the Fidelity & Deposit Company and sustaining exceptions of misjoinder of other defendants and striking from plaintiff's petition all the allegations of separate suits and causes of action against the several defendants, leaving only the joint action against the three named defendants based on the allegations of conspiracy. Thereupon, the court, finding that there remained no separable controversy, remanded the cause to the state court. At that time, however, the court announced that the entry of the order on such judgment would be withheld until January 15, 1933, in order to extend to plaintiff the opportunity of taking such steps as it saw fit in contemplation of said ruling. On January 10, 1933, and before the order referred to had been entered, the plaintiff filed motion for new trial. On January 16, 1933, the court signed a decree in accordance with its judgment announced on December 22, 1932, but extended to plaintiff the right to present at a later date its motion for new trial. The court, with the consent of all parties, then entered a decree postponing the hearing on the motion for new trial until the February term of said court. Thereafter, on March 10, 1933, at the February term of said court, an order was entered setting aside the order of December 22, 1932, and the court then entered a decree dismissing the suit as to the defendant Fidelity & Deposit Company and remanding the cause as to all other parties to the state court. Appellant now contends that when the federal court sustained exceptions to and struck from plaintiff's petition all allegations of separate suits and causes of action against the several defendants and rendered its decree of December 22, 1932, remanding the cause to the state court, said federal court then and there lost jurisdiction to alter its decree at a subsequent time, and since at that time the separate cause of action against the appellant Pipe Company had been stricken from the petition, the state court never thereafter acquired jurisdiction over said cause of action and consequently had no right to render judgment thereon in this suit. In this connection, it is stipulated that no point is made by appellant that the postponed hearing had in the federal court on March 10, 1933, and the decree rendered therein, was

not made at the same term as the order originally entered by the court as of date December 22, 1932. There are authorities which hold that an order of the federal court remanding a cause to the state court becomes effective immediately and terminates the jurisdiction of such federal court in the premises and thereafter the federal court is without authority to vacate or set aside the order of remand, even during the same term at which it was made. 54 C.J. 372, § 335; Ausbrooks v. Western Union Tel. Co. (D.C.) 282 F. 733. Whether or not this same rule would apply, where at the time the original order of remand was entered a motion for new trial was pending and the court in entering the order of remand states that it will be held in abeyance until the motion for new trial is acted on, is not decided by the above authorities. But be this as it may, we think the state court later acquired jurisdiction over the separate cause of action against the Pipe Company regardless of the procedure had in the federal court. The record discloses that after the case was remanded to the state court all parties filed amended pleadings. The plaintiff in its amended petition again alleged and urged its separate cause of action against the Pipe Company in the same manner that it had originally done. The case went to trial on these new pleadings. The amended pleadings stated a valid cause of action against the Pipe Company to recover on the separate cause of action. The cause of action as so plead was within the potential jurisdiction of the court. The Pipe Company by appearing and filing its answer to the amended pleadings conferred jurisdiction on the court over its person, and the state court then acquired jurisdiction to enter any judgment in the premises coming within the amended pleadings and supported by the evidence. Houston & T. C. Ry. Co. v. Walker, 107 Tex. 241, 173 S.W. 208, par. 1, 177 S.W. 954; Gonzales v. Gonzales (Tex. Civ.App.) 256 S.W. 658, reversed on another point 115 Tex. 16, 273 S.W. 798.

█ The appellant attempts to hedge against the application of the foregoing rule by calling attention to the fact that in its amended answer it filed a plea of limitation to that part of plaintiff's suit, as set up in the amended petition, to recover on the separate cause of action against the Pipe Company, and it here contends that since the federal court stripped the petition of the suit to recover on the separate cause of action and since more than two years elapsed after the accrual of the cause of action and

before the filing of amended petition, its plea of limitation to plaintiff's separate cause of action against the Pipe Company should have been sustained. We cannot sustain this contention. Plaintiff's petition has at all times stated a valid cause of action against the Pipe Company to recover the damages suffered by the city by reason of the alleged misrepresentations and fraudulent conduct on the part of the Pipe Company. It is true, the petition, when stripped by the decree of the federal court of all allegations concerning the separate cause of action against the Pipe Company, left only the suit to recover on the ground of conspiracy among all the defendants, but said petition nevertheless alleged all of the facts and surrounding circumstances under which the cause of action arose and was ample to inform the appellant of the complaint made by the city and of the damages claimed to have grown therefrom. In fact, recovery could have been had thereunder against any of the defendants without proving the conspiracy. 27 C.J. 43. The action to recover on the separate cause of action against the Pipe Company arose out of the same transaction and was based on substantially the same state of facts as was the suit to recover jointly against all of the defendants for the alleged conspiracy. There was therefore no change in the identity of the transaction, and, in our opinion, the petition to recover on the joint cause of action was sufficient to toll to the statute on the action to recover on the separate cause of action against the Pipe Company, which grew out of the same state of facts. 25 Tex.Jur. 215; Cotter v. Parks, 80 Tex. 539, 16 S.W. 307; Southern Surety Co. v. First State Bank (Tex.Civ.App.) 54 S.W.(2d) 888. Certainly the cause of action as set up in the amended petition, after the case was remanded to the state court, was not wholly based upon and did not grow out of a new, distinct, or different transaction or occurrence from that previously alleged, and consequently the original pleading stripped as it was by the order of the federal court was sufficient to stop the running of limitation on the cause of action here recovered on. Vernon's Ann. Civ.St. art. 5539b (Acts 1931, 42d Leg., p. 194, c. 115, § 1); 28 Tex.Jur. 213.

█ Judgment was rendered for the city for the difference between the amount expended by the city for the pipe line and the amount found by the jury as the reasonable value of the line as installed. The appellant complains of the measure of damages applied and contends in substance that

1112

the defect in the line was due in part to the failure of the contractor to install the line in the manner called for in the contract and that if the contractor had properly bedded the pipe as it should have done, even though the pipe was defective, the line would have been worth much more to the city than was found by the jury, and hence appellant's liability would have been materially reduced. Its contention in effect is that it is being made to pay for the shortcomings of the contractor as well as its own. The jury found that the Pipe Company's agents induced the city's engineers to specify Hi-tensile pipe and knowingly represented to the city's engineers that the Hi-tensile pipe so specified and actually sold by the Pipe Company to be installed in said line was adequate in strength for the purposes intended but that in truth and in fact it was not adequate and the Pipe Company's representatives knew or had reasonable cause to know that said pipe was inadequate in strength for the purposes intended. From these findings we think it necessarily follows that the Pipe Company by its improper conduct knowingly prevented the city from getting what it contracted and paid for. Where a building contractor breaches his contract so that there is not a substantial performance, he is not entitled to recover on his contract, and if he has been paid therefor, the owner may recover the amount which he has been compelled to pay. Under such circumstances, where benefits have accrued to the owner by reason of material furnished or labor performed by the contractor, equity will some times require the owner to account for the reasonable value of the benefits received, not because the contractor who has breached his contract has any right to rely thereon, but because it would be inequitable for the owner to receive and retain something for nothing at the expense of the contractor. 9 C.J. 818, § 156; Murphy v. Williams, 103 Tex. 155, 124 S.W. 900; City of Sherman v. Connor, 88 Tex. 35, 29 S.W. 1053. In the case at bar the Pipe Company certainly stands in no better position than a contractor would under similar circumstances. It is clear that the city did not get what it contracted for. No finding was made by the jury as to whether the city received substantially what it contracted for and no request was made by the Pipe Company for such findings. See in this connection: 9 C.J. 877, Atkinson v. Jackson Bros. (Tex.Com. App.) 270 S.W. 848, 38 A.L.R. 1377; Nieman-Irving & Co. v. Lazenby, 263 N.Y. 91, 188 N.E. 265; Spence v. Ham, 163 N.Y.

220, 57 N.E. 412, 51 L.R.A. 238; Perry v. Quackenbush, 105 Cal. 299, 38 P. 740. Moreover, we think it necessarily results as a matter of law that since the pipe of which the line was built, as found by the jury, is inadequate in strength and in view of the undisputed evidence of the number of breaks that have occurred, the city did not get substantially the kind of line that it contracted for. 9 C.J. 749; Perry v. Quackenbush, 105 Cal. 299, 38 P. 740; Nance v. Patterson Bldg. Co., 140 Ky. 564, 131 S.W. 484, 140 Am.St.Rep. 398. Under these circumstances, the Pipe Company is not entitled to offset against the amount paid out by the city for the building of the line the amount that the line would have been worth to the city if the contractor had properly performed its part of the contract, but is entitled as an offset only the reasonable value of what the city received.

We have carefully considered all other assignments of error, including the city of Waco's cross assignments of error, and find them without merit.

The judgment of the trial court is affirmed.